**TECTONICS INC. OF FLORIDA**

v.

**The UNITED STATES.**

No. 600–84C.

United States Claims Court.

July 3, 1986.

David W. Mockbee, Jackson, Miss., for plaintiff.

Carol N. Park-Conroy, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Sandra P. Spooner, Washington, D.C., for defendant.

## OPINION

WHITE, Senior Judge.

The plaintiff, Tectonics Inc. of Florida (Tectonics), instituted this action under the direct-access provisions of the Contract Disputes Act of 1978 (41 U.S.C. § 609 (1982)), and the case was later tried on the merits.

The cause of action arose in connection with the performance by the plaintiff of contract No. N62467–79–C–048A (the contract) between the plaintiff and the United States (represented by a contracting officer of the Department of the Navy). Under the contract, which was awarded to the plaintiff on July 20, 1982, the plaintiff was to renovate and expand an existing facility, known as the Naval and Marine Reserve Center Training Building (the Reserve Center), located on the south side of Old Spanish Trail Boulevard (Old Spanish Trail), in Houston, Texas. The contract also required the plaintiff to do certain related utilities work, and to expand an existing parking lot at the Reserve Center. The original contract price to be received by the plaintiff amounted to $2,520,000, and the original contract completion date was September 3, 1983. The completion date was later extended; and the Reserve Center was accepted for occupancy by the Navy Department following the final inspection on April 5, 1984.

### The Claims

At the trial, the plaintiff presented evidence relating to six separate claims for additional compensation. These claims were based upon:

(1) alleged delay by the Navy Department in making certain payments due the plaintiff, thus allegedly entitling the plaintiff to interest for the periods of delay;

(2) delay by the Navy Department in making the final inspection of the project, beyond the date requested by the plaintiff;

(3) changes in the contract plans and specifications relating to the construction of new storm sewer lines;

(4) change in the height of interior dry walls;

(5) the necessity of repairing damage done to an existing storm sewer line; and

(6) retainage by the Navy Department of $10,000 of the contract price.

### Oral Motion to Dismiss

Immediately after the plaintiff completed the presentation of its evidence, defendant's counsel made an oral motion to dismiss the complaint under RUSCC 39(b). The attorneys for the parties then submitted oral arguments on the motion. Thereafter, the court, ruling from the bench, partially granted the motion, holding that claims numbered (1) and (2) in the preceding part of this opinion were not supported by the evidence. Otherwise, the motion was denied.

The trial subsequently resumed, and was completed.

The proceedings concerning the defendant's motion to dismiss are set out at pages 257–88 of the transcript of the trial.

### The New Storm Sewer Lines

The contract provided in part that the plaintiff was to construct two new storm sewer lines—a 15–inch line and an 18–inch line—from the two parking lots on the Reserve Center grounds. One parking lot was located on the east side and the other on the west side of the Reserve Center building. Each storm sewer line was to run in a northerly direction, and was to be connected at the north end with the City of Houston's storm sewer system running along Old Spanish Trail.

Old Spanish Trail is a 4–lane highway running east and west, with a median strip between the eastbound and westbound traffic lanes. As previously stated, the Reserve Center grounds border on Old Spanish Trail, and are located on the south side of the street.

The contract drawings indicated that the city's storm sewer system was located underground in the median of Old Spanish Trail. After the contract was entered into, however, the plaintiff discovered that the contract drawings erred in showing that the city storm sewer system was located in the median strip of Old Spanish Trail. Actually, the city storm sewer system runs underground along the north side of Old Spanish Trail (*i.e.*, the opposite side of the

street from the Reserve Center). This made it necessary for the plaintiff to extend each of the two new storm sewer lines 33 feet farther than was indicated on the contract drawings.

Also, the contract provisions relative to the two new storm sewer lines indicated that the trench-and-backfill method was to be used in laying the pipe for the new lines. However, when the plaintiff sought a permit from the City of Houston to use the trench-and-backfill method in crossing Old Spanish Trail, permission was refused. As a result, it was necessary for the plaintiff to use a boring method in extending the two new storm sewer lines from the Reserve Center grounds, underneath the pavement on Old Spanish Trail, to the connection with the city's storm sewer system on the north side of Old Spanish Trail.

In addition, the contract provisions relative to the elevations at which the new storm sewer line from the east parking lot was to be constructed were defective, in that standing water at the northerly end of the pipe would have been a problem if the line had been constructed at the elevations prescribed in the contract.

In November 1982, the plaintiff notified the Navy Department of the deficiencies in the contract provisions previously mentioned, and requested that the necessary changes be made. More than 6 months later, the Navy Department provided the changes in Change P00013.

In a letter dated June 17, 1983, the Navy Department issued to the plaintiff a directive which stated in part as follows:

Pursuant to Clause 3, "Changes" of the General Provisions, you are hereby directed to proceed with the following change(s) to the subject contract, at a cost not to exceed $15,105.74 and time not to exceed zero days: Provide labor, material and equipment to install 33 L.F. of 18″ storm sewer pipe and 33 L.F. of 15″ storm sewer pipe under Old Spanish Trail Street, install 12″ storm sewer pipe in lieu of 10″ storm sewer pipe to MH No. 2, temporary tie-in of assisting roof drains to drain system, and provide site

investigation to determine existing grades of utility lines not shown on plans.

Part of the reason for the delay in issuing the notice to proceed was delay on the part of the contracting officer, who was stationed in Charleston, South Carolina, in notifying field personnel of the Navy Department that funds were available to defray the cost of the extra work.

As the plaintiff could not perform the boring work at Old Spanish Trail with its own forces, the plaintiff engaged I.W.W., Inc., a specialty subcontractor, to extend the new storm sewer lines from the Reserve Center grounds underneath the pavement at Old Spanish Trail, and connect the lines with the city storm sewer system on the north side of Old Spanish Trail. I.W.W., Inc., in turn, engaged Osborn Boring Company as a second-tier subcontractor to perform the actual boring work.

On May 17, 1983, I.W.W., Inc., the subcontractor, submitted to the Texas State Highway and Public Transportation Commission a request for permission to bore under the paving on Old Spanish Trial. A permit was issued by the Commission on June 2, 1983.

The work of boring under the pavement on Old Spanish Trail began on June 16, 1983; and the work was completed on June 21, 1983. Only three actual working days were involved, as the period June 16–21 included a weekend and a day of rain on which no work was done.

It was necessary that two holes be bored underneath the pavement on Old Spanish Trail, one for each new storm sewer line. In preparation for the boring at each point, it was necessary that a large pit, 10 feet square and 10 feet deep, be dug at the edge of the street right-of-way. The pit had to be large enough to accommodate the boring machinery, with its recoil action. Following the completion of the work, it was necessary to refill the pits.

The plaintiff was compensated in the amount of $12,437.31 under Modification No. P00013/Unilateral for the extra work done in connection with the construction of the two new storm sewer lines.

The plaintiff's claim before the court for the extra work done because of the defects in the contract provisions relative to the construction of the two new storm sewer lines amounts to $30,441.63. The plaintiff says that it sustained damages in the actual amount of $42,878.94, and that this amount has been reduced to $30,441.63 by the Government's payment of $12,437.31 under Modification No. P00013/Unilateral.

The plaintiff's figure of $42,878.94, representing the actual damages allegedly sustained by the plaintiff because of the errors in the contract provisions relating to the construction of the two new storm sewer lines, includes as an important element 17 days of overhead claimed by the plaintiff at the rate of $1,098.82 per day. The plaintiff, in this connection, asserts that the Navy Department's delay in correcting the erroneous contract provisions relative to the construction of the two new storm sewer lines, after being requested by the plaintiff to do so, not only prevented the plaintiff from beginning the work on the construction of the new storm sewer lines, but also adversely affected the progress of the work on other aspects of the project. The plaintiff estimates that, as a consequence, the completion of the entire project was delayed to the extent of 17 days.[1]

■ The evidence in the record does not support the plaintiff's claim for overhead in connection with the effect of the errors in the contract provisions relating to the construction of the two new storm sewer lines.

For one thing, the plaintiff failed to prove that the Navy Department's delay in correcting the errors in the contract provisions relative to the construction of the new storm sewer lines adversely affected the beginning or the progress of the work

1. The plaintiff used the so-called Eichleay formula in computing the amount of the daily rate for the overhead. Under the circumstances, it is unnecessary to discuss the acceptability of the Eichleay formula.

on other aspects of the project. Actually, the evidence in the record shows that the construction of the two new storm sewer lines was the only work to be performed by the plaintiff in the particular area of the Reserve Center complex. Consequently, it is difficult to perceive how delay in beginning the construction of the new storm sewer lines could have caused any delay in the beginning or the performance by the plaintiff of other aspects of the work under the contract.

Furthermore, the construction of the new storm sewer lines was completed several months before the other work under the contract was completed. Hence, the final date for the completion of the work under the contract was not adversely affected by the delay that occurred in connection with the construction of the two new storm sewer lines.

It necessarily follows that the plaintiff is not entitled to any reimbursement for overhead in connection with the portion of the contract relating to the two new storm sewer lines.

■ It is not clear whether the plaintiff's figure of $42,878.94 includes any amount relating to the error in the contract provisions relating to the elevations at which the new storm sewer line from the east parking lot was to be constructed. In any event, the record lacks proof that the plaintiff sustained any detriment by reason of having to construct the storm sewer line at elevations different from those shown in the original contract provisions. Consequently, the plaintiff is not entitled to any recovery on the basis of this change in the contract provisions.

There remains for consideration the question of whether the plaintiff is entitled to recover on the basis of the changes in the contract provisions which made it necessary to extend each new storm sewer line for a distance of 66 feet from the Reserve Center grounds to the connection with the city storm sewer system on the north side of Old Spanish Trail, by boring a hole underneath the pavement on Old Spanish Trail, instead of extending the line by the trench-and-backfill method a distance of 33 feet from the Reserve Center grounds to the median strip in Old Spanish Trail, as provided in the original contract provisions. The test is whether, as a result of the contract changes, the plaintiff's pecuniary position was adversely affected. *Cf. Miller v. Robertson,* 266 U.S. 243, 257, 45 S.Ct. 73, 78, 69 L.Ed. 265 (1924); *G.L. Christian and Associates v. United States,* 160 Ct.Cl. 1, 11, 312 F.2d 418, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

The cost to the plaintiff of the work actually performed under the changed contract provisions was $19,650, the amount which the plaintiff paid to the subcontractor, I.W.W., Inc. There is no way, however, of determining precisely what the cost of the work would have been if it had been performed in accordance with the original contract provisions.

The plaintiff estimates that it would have cost only $2,850 to extend the two storm sewer lines 33 feet each across Old Spanish Trail to its median, using the trench-and-backfill method of laying the pipe. According to this estimate, the extra cost of doing the work in accordance with the changed contract provisions would have amounted to $16,800.

The plaintiff's figure of $2,850 as the estimated cost of performing the work under the original contract provisions is deemed by the court to be unduly conservative. It must be considered that performing the work in accordance with the original contract provisions would have involved crossing the south lane of Old Spanish Trail at two places for a distance of 33 feet each and, at each place, cutting and removing the street pavement, digging a trench, laying the pipe, refilling and properly compacting the material in the trench, and repaving the surface of the trench, not to mention the necessity of barricading the south lane of Old Spanish Trail and providing flagmen to direct traffic while the work was in progress.

Witnesses for the defendant expressed the opinion that constructing the storm

sewer lines through the boring method underneath the pavement on Old Spanish Trail was both easier and more efficient than crossing Old Spanish Trail through the trench-and-backfill method would have been, thereby seeming to imply that the plaintiff was not adversely affected by these contract changes.

The value of this testimony must be discounted. It was necessary, under the changed contract provisions, to bore underneath the pavement on Old Spanish Trail for a total distance of 132 feet for the two lines, whereas crossing Old Spanish Trail to its median under the original contract provisions would have required trenching to the total extent of only 66 feet for the two lines.

The circumstance that the court is unable to determine with complete accuracy what the cost to the plaintiff would have been if it had only been required to extend the two new storm sewer lines across the south lane of Old Spanish Trail to the median of the street by using the trench-and-backfill method of laying the pipes, as provided in the original contract provisions, does not necessarily preclude the court from making a finding as to the amount of such costs, in order to decide the amount of the damages sustained by the plaintiff from these particular contract changes. The fact that some damage was sustained by the plaintiff seems to be clearly established, and it appears that a reasonable basis of computation is afforded. *Cf. Oliver-Finnie Company v. United States,* 150 Ct.Cl. 189, 197, 279 F.2d 498, 503 (1960). In such a situation, it is permissible for the court to resort to what is commonly referred to as a "jury verdict" type of finding in determining a factual issue relating to the amount of damages. *United States v. Smith,* 4 Otto 214, 219, 94 U.S. 214, 219, 24 L.Ed. 115 (1876); *Teitelbaum v. United States,* 198 Ct.Cl. 150, 165, 458 F.2d 72, 81 (1972); *Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 253, 416 F.2d 1345, 1355 (1969).

Upon the basis of all the pertinent evidence in the record, it is found by the court that it would have cost the plaintiff approximately $5,000 to extend the two new storm sewer lines across the south lane of Old Spanish Trail to the median in the street, using the trench-and-backfill method, as provided in the original contract provisions.

Accordingly, it is determined that the plaintiff sustained damages in the amount of $14,650 ($19,650 minus $5,000) as a consequence of the changes in the contract provisions relating to the construction of the two new storm sewer lines.

### The Interior Drywalls

Under the provisions of the contract, the interior drywalls at the Reserve Center were to be installed at a height of 9 feet, and the installation was to be accomplished after the ceilings at the Reserve Center were in place.

The drywalls were actually installed at a height of 9 feet 2 inches, and the installation took place before the ceilings at the Reserve Center were in place.

Because of the change in height, the plaintiff has submitted a claim in the amount of $56,420.31, based in part on an estimate that it cost C. Bob Bell, the drywall subcontractor, $19,865.88 more to install the drywalls at a height of 9 feet 2 inches than it would have cost to install the walls at a height of 9 feet, and in part on the plaintiff's claim that it is entitled to overhead in the amount of $36,554.43 because the installation of drywalls at a height of 9 feet 2 inches, instead of a height of 9 feet, allegedly caused delay in the overall progress of the work on the project.

The evidence indicates that the problem of the drywall height arose because C. Bob Bell, the drywall subcontractor, arrived at the job site before the ceilings at the Reserve Center had been installed. The plaintiff concluded that, as C. Bob Bell was already at the job site, it would be preferable if Bell proceeded with the installation of the walls, but that, as the ceilings were not yet installed, the walls should be installed at a height of 9 feet 2 inches, rather

than at the height of 9 feet as indicated in the contract. The matter was discussed with the Navy Department's project engineer and the Title II inspector on the job.

Witnesses on behalf of the plaintiff testified at the trial that both the project engineer and the Title II inspector orally approved the plaintiff's proposal that the interior drywalls be installed before the installation of the ceilings and at a height of 9 feet 2 inches.

The Navy Department's project engineer was a witness at the trial. According to his testimony, what he said to the representatives of the plaintiff concerning the proposed drywall change was that he had no objection to the change, provided it would not cost the Navy Department any additional money. His version of the supposed approval is accepted, particularly as the evidence failed to show any benefit to the Navy Department from the change.

The Title II inspector did not testify at the trial. In any event, the evidence makes it very clear that he did not have any authority (neither did the project engineer, for that matter) to speak for the Navy Department in connection with any proposal to change the provisions of the contract. Judicial decisions (*e.g., Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Housing Corp. of America v. United States*, 199 Ct.Cl. 705, 711–12, 468 F.2d 922, 925 (1972)) have made it plain that the Government is not bound by the unauthorized acts of its agents.

Accordingly, as the Government did not direct that this change be made, but, in effect, impliedly assented to it by failing to object, the defendant is not liable for any increase in the plaintiff's costs of contract performance that may have resulted from the change.

### The Broken Pipe

One of the jobs to be performed by the plaintiff under the contract was to extend the east parking lot on the Reserve Center grounds. This work involved clearing grass and other material from the area that was to be added to the parking lot, thoroughly pulverizing the remaining soil to a depth of 6 inches from the top of the subgrade, adding a lime slurry to the pulverized soil, rolling and compacting the soil to a density of 95 percent, and then paving the surface.

The area that was to be added to the parking lot contained an underground sanitary line. The contract drawings accurately disclosed the location and size of the pipe, but did not contain any information regarding its depth below the surface of the ground.

In preparation for the performance of this work, a representative of the plaintiff measured the depth of the sanitary pipe at the cleanout point and at its lower end. Based upon these data, the change in the elevation of the ground surface between the upper and lower ends of the pipe, and past experience in dealing with such situations, the plaintiff concluded that the top of the pipe was more than 6 inches below the ground surface at all points involved in the prospective ground stabilization process, and that the pipe would not be damaged in the operation.

During the process of pulverizing the soil to a depth of 6 inches, however, the heavy pulverizer struck and damaged about 20 feet of the sanitary pipe. The top of the pipe was less than 6 inches below the ground surface at that point.

The plaintiff repaired the broken pipe and lowered the pipe sufficiently, so that the subsurface could be properly prepared for the addition of the pavement.

The plaintiff claims $1,195 as the alleged cost of the additional work caused by the breaking of the sanitary pipe. This amount is not disputed by the defendant.

The defendant does call attention, however, to General Provision 36(b), which, in the following language, placed an obligation upon the plaintiff with respect to the protection of existing utilities from damage during the performance of the work under the contract:

(b) The Contractor will protect from damage all existing * * * utilities at or near the site of the work, the location of which is made known to him, and will repair or restore any damage to such facilities, resulting from failure to comply with the requirements of this contract or the failure to exercise reasonable care in the performance of the work. * *

The defendant also calls attention to General Provision 35 of the contract, which provides in part as follows:

* * * The Contractor * * * acknowledges that he has satisfied himself as to the character, quality and quantity of * * subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, * *. * as well as from information presented by the drawings and specifications made a part of this contract. * * *

As indicated earlier in this part of the opinion, the size of the underground sanitary pipe was not "reasonably ascertainable" from an inspection of the site or from information presented by the contract drawings and specifications.

■ The location of the sanitary pipe, however, was accurately depicted on the contract drawings. The plaintiff, before disturbing the soil to a depth of 6 inches below the ground surface in the area shown to contain the pipe, undoubtedly had an obligation to exercise due diligence in attempting to determine the depth of the top of the pipe below the surface, as the plaintiff was aware that the pulverizing machine might damage the pipe. In an effort to discharge that obligation, the plaintiff measured the depth of the sanitary pipe at the cleanout point and at the lower end; and concluded, upon the basis of these data, the change in the elevation of the ground surface from the upper end to the lower end of the pipe, and past experience in such situations, that the top of the sanitary pipe was more than 6 inches below the surface of the ground through-

out the area to be affected by the pulverizing operation.

The court concludes that the plaintiff exercised the necessary due diligence in connection with this matter; and that the damage to the sanitary pipe was due to the defendant's failure to furnish to the contractor accurate information regarding the depth of the sanitary pipe below the surface of the ground. Accordingly, the plaintiff is entitled to recover $1,195 on this particular claim.

### Retainage

■ The plaintiff presented evidence at the trial—and the defendant conceded—that the defendant is still withholding $10,000 of the contract price.

The defendant presented evidence to the effect that, at the time of the trial, the plaintiff still had not completed one item of work required by the terms of the contract. This item was described as a defect in the roof of the Reserve Center which caused some "ponding" of rainfall on the roof, instead of all rainfall draining properly from the roof. The representative of the defendant further testified that the Navy Department will promptly pay the retained $10,000 to the plaintiff as soon as the necessary work on the roof is completed and an invoice is submitted to the Navy Department.

No evidence was presented by the plaintiff to show that $10,000 is an excessively high amount of retainage to serve as a guaranty that the roof defect will be corrected.

Consequently, the plaintiff is not entitled to recover, in this litigation, the $10,000 retained by the defendant. The rejection of this particular claim in the present litigation is without prejudice to the right of the plaintiff to file another complaint on this claim if the Navy Department fails to pay the $10,000 to the plaintiff within a reasonable period of time after the plaintiff completes the work on the roof of the Reserve Center and submits an invoice to the Navy Department.

## CONCLUSION OF LAW

Upon the facts as found by the court, the court concludes as a matter of law that the plaintiff is entitled to recover $15,845 on its claims with respect to the construction of the two new storm sewer lines and the repair of the broken sanitary pipe, and is not entitled to recover on any of the other claims set out in the complaint.

The clerk will enter judgment for the plaintiff in the amount of $15,845.

No costs.

IT IS SO ORDERED.