**R.P. RICHARDS CONSTRUCTION COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–432C.

United States Court of Federal Claims.

Nov. 8, 2001.

William L. Bruckner, Bruckner & Walker, San Diego, California, for plaintiff.

Timothy P. McIlmail, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, with whom on the brief were Thomas A. Coulter, Trial Attorney, Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, and David W. Ogden, Acting Assistant Attorney General.

## OPINION

MARGOLIS, Senior Judge.

In its first cause of action, plaintiff, R.P. Richards Construction Company, seeks compensation on behalf of its subcontractor Romero General Construction ("Romero") for additional costs incurred as a result of additions and deletions to asphalt quantities and patch sizes and associated asphalt related repairs along two asphalt paved roads on Camp Pendleton Marine Corps Base, California (the "patch size claim"). In its second cause of action, plaintiff seeks compensation for additional costs arising out of four claims: (1) a stop work claim on August 7, 1995; (2) a stop work claim/two week delay from August 8 through August 21, 1995; (3) a claim for severing a utility line; and (4) a claim for disruptive changes in phasing/remobilization. Based on the evidence presented at a three-day trial in San Diego, California, on May 22–24, 2001, as well as the parties' pre- and post-trial briefs, this Court holds that plaintiff's first cause of action for changes in patch size is covered by modification P00004 and therefore must fail. With respect to plaintiff's second cause of action, this Court finds that the government is liable for costs incurred as a result of the work stoppage on August 7, 1995, the two week delay from August 8 through August 22, 1995, and the severed utility line. The plaintiff's claim for disruptive changes in phasing/remobilization, however, is denied.

### FACTS

#### A. First Cause of Action—Patch Size Claim

On May 18, 1995, plaintiff entered into a firm, fixed price construction contract with the Department of the Navy ("Navy") to repair Basilone and Las Pulgas Roads at the Camp Pendleton Marine Corps Base in Oceanside, California. The plaintiff contracted to complete 401,846 square feet of full depth asphalt patching. The contract required plaintiff to cut and remove old asphalt patches, repair the underlying base as required and put in new asphalt patches. On June 26, 1995, plaintiff subcontracted with Romero to provide all labor, equipment, supervision, shipping, storage, and materials necessary to repair Basilone and Las Pulgas Roads. Under the original contract, plaintiff was to remove approximately 371,000 square feet along Basilone Road and approximately 31,000 square feet along Las Pulgas Road.

Due to limited funds available for the contract, the Navy could not exceed these square footage totals. As contracted, the asphalt patching was divided into three phases: (1) *Phase I:* Basilone Road from the San Onofre gate to Las Pulgas; (2) *Phase II:* Basilone Road at Vandegrift Boulevard and the Three–Mile Pit Road; and (3) *Phase III:* Intersection of Basilone Road and Three–Mile Pit Road to Las Pulgas Road. The Navy increased work in phase one along Basilone Road because of increased deterioration.[1] Thus, in order to remain within its square footage limitation, to compensate for the increase along Basilone Road and to ensure that only the most critical areas were repaired, the Navy deleted approximately 30,000 square feet of patching along Las Pulgas Road and approximately 281,000 square feet in part of phase one and all of phase two. It also added approximately 54,000 square feet in phase two. In total, the Navy added and deleted approximately 311,000 square feet of patching. Even with all of the changes there is no dispute that the Navy subtracted from the contract almost the same amount of square footage asphalt that it added due to the deterioration.

Despite the fact that the total square footage remained approximately the same, the Navy's redesign increased the actual number of patch removals and simultaneously decreased the average square footage per patch. The actual patches removed were smaller, non-symmetrical and had multiple edges. Plaintiff claims that the reduced size and change in overall shape made the contract much more costly to complete.[2] Consequently, on September 12, 1995, Romero alerted plaintiff of the increased costs:

> The new areas ... differ greatly from the scope of the contract that we agreed upon. As a result we cannot operate at the same unit cost and therefore our average cost per square foot over the entire job is negatively affected. Due to this change we

believe an increase of price per unit is required.

Pl Ex 147. On September 18, 1995, plaintiff replied to Romero stating, "[t]he Navy has responded verbally that they consider none of the additions or deletions made to date to alter the scope of the contract. The unit price covers all work performed to date." Df Ex 16. At that point in time, plaintiff concurred with the Navy that "the mark-out differences [did not] constitute a contract change," but plaintiff gave Romero the opportunity to provide additional documentation in support of its claim. Df Ex 16. Romero submitted a letter containing a more complete description of its increased per unit costs on September 20, 1995. This letter explains the inefficiencies and increased costs associated with increasing the number of patches at a reduced size. Romero stated:

> Knowing that we would remove on average 1070 square feet per patch we felt comfortable with our original price. Removing [instead] 500 + square feet per patch has increased our costs dramatically. It was impossible to foresee this change since each days (sic) work was painted out one day before.
>
> Due to such a change in scope we are requesting an additional [$].48/per SF for the 379,000 square feet already removed.

Pl Ex 5–97.

As a result, on December 18, 1995, plaintiff submitted a Request for Equitable Adjustment ("REA") and supporting documents to the Navy on behalf of Romero to recover for the alleged increase in costs. The REA states that "change in character of work" includes both the changes to the *quantity* of patch areas and the *size* of each individual patch area. Chapter 1–20 of the REA specifies that the complaint is about the change in the size of each patch and states, "the difference in the character of work between the as

---

1. As bid, phase one consisted of 62,000 square feet, however as built, Romero actually completed an additional 257,000 square feet raising the total square footage in phase one to 319,000 square feet.

2. Plaintiff maintains that the larger the removal area, the more efficient the removal process and

the cheaper the removal cost. Plaintiff claims it is more profitable to remove and replace one 1000 square foot patch than it is to remove five 200 square foot patches. Therefore by increasing the number of patches and decreasing the size of each, the cost per patch increased.

planned and the as built can be seen clearly in the graphical representation of the as built versus the as planned average square footage per patch per sheet." Pl Ex 5–6. Chapter 1–21 compares the as-planned area at approximately "25 areas for removal and patching at an average square footage of approximately 3,496 square feet per patch" with the area as built to be "approximately 93 areas for removal and patching at an average square footage of approximately 645 square feet per patch . . . ." Pl Ex 5–6. Chapter 1–21 further states that this change in patch size "constitutes a change in scope of work" for that specific area.[3] Pl Ex 5–6.

Throughout the contract, plaintiff and the Navy executed nine modifications to cover the numerous changes made to the original contract. On September 11, 1995, in modification P00004, they specifically negotiated the terms of the additions and deletions to the full depth patching as built versus as planned. Modification P00004 states in relevant part:

> As negotiated on 11 September 1995, the parties hereto mutually agree to the following:
>
> 1. Delete all contract *quantities* of full depth patching on Basoline Rd. between stations 0+0 & 723+60, approximately 281,000 square feet, and on Las Pulgas Rd. between stations 0+0 and 267+50, approximately 30,000 square feet. Total deletion approximately 311,000 square feet.
>
> 2. Add *quantities* not included in the contract on Basilone Rd. between stations 723+60 and 970+72, approximately 257,-000 square feet, and *quantities* marked in green between stations 0+0 and 60+0, approximately 54,000 square feet. Total additions are approximately 311,000 square feet.

Pl Ex 3–20 (emphasis added).

The government argues that Modification P00004 covers the same changed areas Romero complains about in its REA and thus covers plaintiff's cause of action. The government contends that modification P00004 represents all changed areas on the project, and therefore any claim as to those changes is barred by the release language included in P00004. The release language in P00004 states:

> Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised.

Pl Ex 3–20. The plaintiff argues that the language of its claim and the REA are substantially if not wholly dissimilar from the language of P00004. The plaintiff contends that modification P00004 "contains no language to alert the contractor that it purports to include the patch size claim" and that plaintiff "never understood or interpreted P00004 to cover the patch size issue." Thus plaintiff claims it never waived any of Romero's rights to additional compensation due to the changes. If the Court finds P00004 includes the patch size claim, then the release language in P00004 forecloses plaintiff's claim. Therefore, this Court must decide whether or not the plaintiff's claim is covered by modification P00004.

### B. *Second Cause of Action—The Four Claims*

The four claims in the second cause of action arise out of alleged government caused delays, differing site conditions and remobilization. Before the actual work began, all parties were aware that the condition of the existing asphalt road differed from what the contract documents contemplated. Because the contracting officer is the only person authorized to make changes to the contract, the Navy agreed to have an authorized representative on site or provide direction within 20 minutes of discovering a changed condition. On August 7, 1995, the initial day of production, Romero encountered a changed condition—the asphaltic concrete ("A/C") was

---

3. Chapter 1–22 of the REA describes the areas deleted as both a change in size of the patch area and change in quantity of patches. The as-planned area for deletion included "approximately three areas for removal and patching at an average square footage of approximately 18,-023 square feet per patch," whereas, the "as built ... consisted of [zero] areas for removal and patching at an average square footage of [zero] square feet per patch." Pl Ex 5–6.

12 inches thick instead of the expected six inches. Romero immediately notified plaintiff of the changed condition, who in turn attempted to contact the Navy for direction. Romero, although fully mobilized, suspended work and awaited direction. The Navy did not respond. After six hours, Romero was forced to finish all open areas and provide full access to traffic. Plaintiff claims that this six-hour delay on August 7, 1995 affected all labor and equipment and was thus a constructive "stop work order" causing damages.

On August 8, 1995, while remaining idle, Romero again sought direction from the Navy in order to commence construction on August 9, 1995. At 4 p.m. on August 9, 1995, the Navy directed Romero not to conduct paving operations on August 10, 1995. Plaintiff maintains that "Romero understood that direction from the Navy was imminent and [thus] the equipment and Romero's supervisor remained on-site ready to commence work within 24 hours." Pl Post Trial Brief 4. Romero informed the government of the daily expenses accumulating from the delay and continued to seek direction from the Navy.

The Navy provided direction on the A/C depth issue on August 10, 1995:

> When areas are encountered in which the existing A/C Pavement exceeds the six inch depth shown in the contract drawings, remove the top six inches of A/C Pavement and replace with new A/C Pavement. This direction precludes the use of full depth patching, unless otherwise directed, in areas where the existing A/C Pavement exceeds six inches in depth. In areas where the existing A/C Pavement does not exceed six inches in depth, the contractor will proceed as per the contract . . . .
>
> Some of the areas included in the contract require reconditioning of the base due to deteriorating conditions. In these areas a full depth patch will be employed regardless of the existing A/C Pavement depth.

Pl Ex 9–33. Romero informed plaintiff that even with this direction, it was not given direction and total clearance to resume production until August 22, 1995. As a result of standing by "day to day" for direction from the Navy, Romero had its production equipment in place and ready to start at any given

notice. Thus, plaintiff seeks reimbursement for all costs incurred in maintaining the equipment and associated costs during the 10 working-day delay.

The government argues that the delay was due to plaintiff's use of a Roto-mill instead of a sawcutting machine when work began on August 7, 1995. The contract required plaintiff to "[p]rovide neat sawcuts at limits of pavement removal." Df Ex 1/115. On August 7, 1995, the Navy notified plaintiff of its non-compliance with the sawcutting requirement. The government alleges that plaintiff ordered the work stoppage because of the Roto-mill/sawcut issue. The government argues that plaintiff notified the Navy that it would implement the Navy's August 10, 1995 direction and resume work on August 16, 1995. Work did not actually resume until August 22, 1995, after the plaintiff and the Navy negotiated a contract variance relieving plaintiff of the sawcutting requirement. Because a Roto-mill is capable of removing a six inch layer of asphalt from an asphalt depth greater than six inches, the government claims that the Navy's August 10, 1995 direction as to the A/C issue was adequate. The government alleges that any delay caused by the differing site condition ended on August 10, 1995, not on August 21, 1995, as the plaintiff claims. The government thus maintains that the delay was due to plaintiff's decision to suspend work until it negotiated a contract variance, and such a decision constitutes a concurrent delay for which plaintiff cannot recover.

Plaintiff also seeks compensation for costs incurred in striking and severing a telephone line that was allegedly installed in an improper manner and at an improper depth. On August 22, 1995, plaintiff twice struck a telephone line that was buried approximately 17 inches below the surface. Plaintiff maintains and both Romero's and plaintiff's project managers at the time testified that the industry standard for telephone lines is a minimum of 36 inches below the surface. Additionally, telephone lines are customarily either slurry encased or indicated by a warning tape. This telephone line was marked out as to location but not to depth, and had no slurry or marking tape protection. In an

effort to avoid hitting any unknown utility lines, Romero exercised due caution by potholing [4] every 50 feet of the area in question "to ensure that the utility line is placed at a depth lower than the contracted 24 inches." Pl Ex 9–53. This particular telephone line was placed at varying depths, and in order to detect such a variation, Romero would have had to forgo the Navy's direction of 50–foot spacing and instead pothole every five to ten feet. Pl Ex 9–53.

Upon hitting the line, Romero stopped and attempted unsuccessfully to contact a Navy officer who could provide direction. Plaintiff claims that as a result of the Navy's failure to provide direction, "the whole operation came to a holt [sic], workers were standing by, equipment could not be used, asphalt trucks were waiting around, and unexpected expenses continued to accrue ...." Pl Post Trial Brief 16. The only instruction came from someone at the base utilities emergency number who directed plaintiff to leave the immediate area unfinished, mark it with traffic control equipment, and repair it the next day. Thus, plaintiff seeks $9,739 [5] for additional expenses incurred as a result of hitting the telephone line.

Plaintiff's final claim is for costs incurred as a result of the Navy's alleged disruptive change in phasing and remobilization. Plaintiff bid on this project to be constructed in three continuous overlapping phases. According to the contract the sequence of the work was: (1) *Phase I:* Basilone Road from the San Onofre gate to Las Pulgas; (2) *Phase II:* Basilone Road at Vandegrift Boulevard and the Three–Mile Pit Road; and (3) *Phase III:* Intersection of Basilone Road and Three–Mile Pit Road to Las Pulgas Road.

Plaintiff maintains that the as-bid production schedule allowed for the three phases to be completed without ever having to remobilize. Plaintiff planned the production schedule allowing Romero to, for example, complete a southbound section of Basilone Road, then on the following day reverse directions

and complete the northbound side. Upon completing the opposite side, Romero would then "walk" the equipment the short distance to the following day's starting point. On September 5, 1995, the Navy directed plaintiff to reverse the direction of the paving operation. On September 9, 1995, plaintiff informed the Navy that the order to reverse operations created inefficiencies, delays, and disruptions to the work, and the specified phasing was significantly altered. On September 11, 1995, the Navy directed Romero to cease following the as-bid production schedule and instead proceed per the Navy's direction. The Navy then directed plaintiff to ignore all previously marked removals and information and to remobilize its labor and equipment approximately 18–20 miles south to Vandegrift where plaintiff was directed to remove and replace new green areas marked by the government. Plaintiff claims that it was forced to pool resources from other contracts outside the military base to ensure that this "surprise and non-bid remobilization as directed by the [g]overnment would be performed successfully." Pl Post Trial Brief 19.

Plaintiff claims that it was denied the opportunity to efficiently complete the contract due to continual and unscheduled changes in direction. Plaintiff seeks an equitable adjustment for the expenses incurred for unplanned mobilization and remobilization and compensation for delay and extra work expenses incurred by Romero as a result of the drastic change to its phasing and completion schedule.

### DISCUSSION

This case requires the Court to resolve two separate but not mutually exclusive causes of action. The first cause of action is whether modification P00004 covers the plaintiff's patch size claim. If so, then the accord and satisfaction language of P00004 bars plaintiff's first cause of action and part of the second cause of action for disruptive changes in phasing and remobilization. The second

---

4. Potholing is an industry term that refers to digging every 25 to 50 feet with a rod or small shovel in order to "see if you could locate anything in the area of work that you were going to be ...." Tr. 147.

5. This figure is the Defense Contract Audit Agency's ("DCAA") undisputed portion of Romero's claim.

cause of action is made up of four sub-issues where the Court must determine whether the government should be held liable for costs incurred as a result of a constructive stop work order on August 7, 1995, a stop work/two week delay from August 8, 1995 to August 21, 1995, a severed telephone line, and disruptive changes in phasing/remobilization.

## A. *The Patch Size Claim*

The parties' primary dispute in the patch size claim involves the scope of the subject matter of modification P00004. Specifically, the threshold question is whether the changes covered by P00004 are identical to the changes that form the basis of plaintiff's claim and the REA. If plaintiff's claim and the REA are covered by modification P00004, then the release language of modification P00004 forecloses plaintiff's claim and the REA. In other words, the release statement would operate as an accord and satisfaction to bar plaintiff's claim and the REA.

■ To be an effective accord and satisfaction, the government must prove that modification P00004 constitutes an accord and the subsequent performance of it constitutes the satisfaction. *See Safeco Credit v. United States*, 44 Fed.Cl. 406, 419 (1999). The essential elements of an effective accord and satisfaction are: (1) proper subject matter; (2) competent parties; (3) meeting of the minds of the parties; and (4) consideration. *See id.* In deciding this issue, the first prong is the crux of the matter. Do the plaintiff's claim and the REA for costs associated with the change in patch size cover the same subject matter as modification P00004? This issue is a question of contract interpretation.

■ In interpreting a contract, "the contract language must be given the meaning which would be derived from a reasonably intelligent person acquainted with the contemporaneous circumstances." *Lockheed Support Systems, Inc. v. United States*, 36 Fed.Cl. 424, 428 (1996); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965). When there is only one reasonable interpretation of a contract term, it is deemed unambiguous and the contract language governs. *Grumman Data Systems Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.

1996). If, however, more than one meaning is "reasonably consistent with the contract language, then the contract term is ambiguous." *Id.* Additional evidence can be considered when there is ambiguity in the terms of the agreement. *See C & H Commercial Contractors, Inc. v. United States*, 35 Fed.Cl. 246, 253 (1996); *Greco v. Department of the Army*, 852 F.2d 558, 560 (Fed.Cir.1988).

■ The government argues that the language of modification P00004 unambiguously covers the same subject matter as plaintiff's claim, and therefore, the release language of P00004 operates as an accord and satisfaction to bar that claim. In fact, the government asserts that modification P00004 represents all changed areas on the project. The government argues that although modification P00004 only uses the word *quantity*, any change in quantities necessarily refers to any and all changes that accompany those quantities, including patch size, shape and location. Further, without the change in quantities referenced in modification P00004, there would be no change in patch size on the project.

Plaintiff argues that modification P00004 does not cover its claim because the basis of the claim is the change in scope of the original contract, *i.e.*, the reduction in the *size* of the patches to be removed and replaced. In fact, plaintiff's claim refers to both *size and quantity*. Plaintiff's claim is for "estimated increased costs of delays and extra work caused by the additions and deletions to asphalt *quantities, and patch sizes, and* associated asphalt related repairs along Basilone Road . . . ." Pl First Amend Compl 3 (emphasis added). Plaintiff further asserts that modification P00004 on its face refers to the change in *quantities, i.e.,* that the changes did not increase or decrease the overall quantity of square footage determined by the original contact, but does not specifically mention patch *size*.

Upon close inspection of the plain language of modification P00004, this Court finds that the scope of the modification is ambiguous. There is not only one "reasonable interpretation" of the scope of the modification. The language itself solely uses the term quantity,

but it could be as the government asserts, that the areas as described, by definition, include the changes in patch size. On the other hand, as plaintiff asserts, it is just as possible that P00004 was not meant to include the change in patch size. In short, it is not clear from the contract whether the part of plaintiff's claim for "changes in patch sizes" is included in modification P00004.

At trial, plaintiff maintained that there are "numerous substantial inconsistencies with the facts concerning the alleged negotiations and intent of the parties regarding P00004. These facts unequivocally indicate that there was no meeting of the minds and the parties all along had different subject matter in mind." Ward Buelow, Richards' Project Manager who negotiated P00004, testified that he believed that the patch size claim and modification P00004 were unrelated, and he indicated that P00004 was never intended to release Romero's rights. Buelow signed a notarized statement indicating that "[a]t no time did R.P. Richards intend for the Contractor's statement of release on P00004, negotiated on September 11, 1995 and signed on September 26, 1995, to waive R.P. Richards' and its Subcontractors claim for equitable adjustment related to changes in patch size . . . ." Pl Ex 11–112. He maintains that modification P00004 was presented as an administrative adjustment necessary to ensure that the Navy's paperwork matched the actual work completed. Thus, plaintiff seeks damages for increased costs of delays and extra work caused by the Navy's additions and deletions to asphalt quantities and patch sizes.

The government maintains that the work areas described in paragraph 1–12 of Romero's REA are the same as those described in paragraphs 1 and 2 of P00004. The government claims that P00004 modified the contract such that Richards would, for no additional cost, perform full depth patching of marked-out, non-contractual patches on Basilone Road, in exchange for the deletion of the contract requirement for full depth patching on Basilone Road and Las Pulgas Road. Further, the government argues P00004 employs the term "quantities," which refers to specific, marked-out patches whose size, shape, location and proximity to other patches were known to all parties by the time P00004 was signed. By the time P00004 was signed, the parties were aware of the areas referred to because the work had already been completed. In addition, Al Giacomazzi, then Vice President of R.P. Richards who signed P00004, testified that the work described in paragraph 1–12 of Romero's REA relates to the work described in paragraphs 1 and 2 of P00004. Tr. 362–68. The government claims that the contractor's statement of release in P00004 operates as an accord and satisfaction to bar plaintiff's claim for changes to the contract associated with the full depth patching on Basilone and Las Pulgas Roads. Giacomazzi further testified that if the patch size claim covers the same areas described in paragraphs 1 and 2 of P00004, then the contractor's statement of release in P00004 covers the claim. Tr. 368.

Based on the evidence and testimony presented at trial, the record shows that plaintiff's patch size claim covers the same areas described in paragraphs 1 and 2 of P00004. As a result, plaintiff's patch size claim must fail. This Court finds that the government successfully demonstrated that modification P00004 covers the same subject matter as Romero's REA. Therefore, the contractor's release statement included in P00004 operates as a valid accord and satisfaction to release the government from liability for any increased costs caused by and associated with modification P00004.

## B. *The Four Claims*

The plaintiff's second cause of action is made up of four sub-issues where the Court must determine whether the government is liable for costs incurred as a result of a constructive stop work order on August 7, 1995, a stop work/two week delay from August 8 to August 21, 1995, a severed telephone line, and disruptive changes in phasing/remobilization.

### 1. *Stop Work Order on August 7, 1995*

■ As stated above, on August 7, 1995, plaintiff encountered a differing site condition when it found A/C that was six inches deeper than expected. Thus, although fully mobilized, Romero suspended work and

awaited direction from the Navy. After six hours and no direction from the Navy, Romero was forced to finish all open areas and provide full road access to traffic. Plaintiff claims that this six-hour delay affected all labor and equipment and was a constructive "Stop Work Order" causing $23,495 [6] in damages. The government maintains that plaintiff cannot recover for costs incurred on August 7, 1995 because the plaintiff does not subtract from that claim the costs of having performed 11,158 square feet of full depth patching before encountering a differing site condition midway into the day.

Based on the evidence and testimony presented at trial, this Court finds that plaintiff is entitled to damages for costs incurred as a result of the differing site condition encountered on August 7, 1995. The amount of such damages is discussed below in the damages section of the opinion.

### 2. Stop Work/Two Week Delay From August 8, 1995 to August 21, 1995

As explained above, plaintiff maintains that Romero encountered a 10 working-day delay in awaiting Navy direction for dealing with the differing site condition. During this time, Romero had its production equipment in place and ready to start immediately. As a result of maintaining its equipment in standby mode, plaintiff seeks reimbursement for all costs incurred in the amount of $15,684.[7] The government argues that use of the Roto-mill instead of the saw cutting machine concurrently delayed the project, and therefore, plaintiff cannot recover.

Based on the evidence and testimony presented at trial, this Court finds that plaintiff was forced to stop work because of the differing site condition. When Romero discovered asphalt six inches thicker than the contract provided for, it awaited direction as it contracted to do. The Navy did not give final direction on the matter until August 22, 1995. Therefore, plaintiff is entitled to recover for costs incurred as a result of the

delay. The amount of the damages is discussed below in the damages section.

### 3. Severed Telephone Line

Plaintiff seeks compensation in the amount of $12,128 for costs incurred in striking and severing a telephone line that was improperly installed at approximately 17 inches below the ground surface. The industry minimum standard is 36 inches. The government argues that plaintiff cannot recover costs for severing the telephone line because the contract did not indicate its depth, and therefore there was not a differing site condition. In the alternative, the government argues that because plaintiff potholed to 30 inches in an effort to locate the telephone line, plaintiff anticipated the discovery of the line at 17 inches. Therefore, discovery of the line at that depth is not a Type II differing site condition.

This Court finds that plaintiff exercised all reasonable care in performing the work by potholing every 25 to 50 feet to a depth of 24 to 30 inches, in compliance with FAR 52.236–9 and the Navy's direction. Plaintiff established at trial that accepted industry standard requires that utilities be placed at a minimum of 36 inches below the surface. Further, although plaintiff contracted to work at a depth of 24 inches, Romero anticipated a possible utility line problem once it encountered the differing site condition. The nature of this particular line, however, made it impossible to detect its exact location and depth without potholing every five to ten feet. Because the plaintiff was not required to pothole that closely, and because plaintiff took all reasonable care in performing the work, this Court finds that the government is liable for costs incurred as a result of an improperly installed telephone line. See Tectonics Inc. of Florida v. United States, 10 Cl.Ct. 296, 303 (1986) (holding that contractor was entitled to recover for costs associated with severing a utility where the contract provided the location of the utility but not its depth). Plaintiff seeks reimbursement in the

---

6. This figure represents the DCAA's unquestioned amount for Romero's costs plus plaintiff's general and administrative expenses ("G & A"), profit, and bond costs.

7. This figure represents the DCAA's unquestioned amount for Romero's costs plus plaintiff's G & A, profit, and bond costs.

amount of $12,128.[8] The amount of damages plaintiff will receive is discussed in the damages section below.

### 4. *Disruptive Changes In Phasing/Remobilization*

 Both parties agree that the work performed differed greatly from the work as bid. Plaintiff claims that it was unable to efficiently complete the contract due to continual and unscheduled changes in the phasing and direction, and it therefore incurred costs that it otherwise would not have. Specifically, the unexpected and disruptive remobilization that plaintiff seeks compensation for is the Navy's direction to stop work in phase one on one end of Basilone Road and relocate to the other end of Basilone Road[9] to continue work on the government's newly marked green areas. Plaintiff seeks compensation in the amount of $48,556[10] for costs incurred as a result of stopping production for two days to bring in additional equipment and manpower to relocate approximately 20 miles.

Defendant argues that Romero's bid was based on the understanding that the contract included a remobilization. Therefore no recovery is warranted. In the alternative, defendant argues that the changes indicated in P00004 encompass plaintiff's disruptive changes in phasing/remobilization claim and thus the contractor's release statement in modification P00004 bars the claim.

This Court finds that plaintiff's claim for disruptive changes in phasing and remobilization is covered by modification P00004. The government demonstrated that P00004 eliminated Phase III of the contract and added the remobilization from one end of Basilone Road to the other end to include the areas marked in green. This is the same remobilization for which plaintiff seeks compensation. Therefore, plaintiff's claim is barred by the contractor's statement of release in P00004 that states in pertinent part:

Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for all any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised.

Pl Ex 3–20.

### *DAMAGES*

 In order to recover damages, plaintiff must establish by a preponderance of the evidence both the reasonableness of the costs claimed and their causal connection to the event on which the claim is based. *See Delco Electronics Corp. v. United States,* 17 Cl.Ct. 302, 319 (1989). Plaintiff "need not prove [its] damages with absolute certainty or mathematical exactitude." *Id.* The burden of proof is satisfied where a reasonable basis for computation of the amount is established. *See id.; see also CCM Corp. v. United States,* 20 Cl.Ct. 649, 656–57 (1990). Although plaintiff must prove the extent of its damages so that the amount determined is more than mere speculation, there is a presumption that its actual costs paid are reasonable. *See North Slope Technical Ltd., Inc. v. United States,* 14 Cl.Ct. 242, 264–65 (1988).

Plaintiff claims Romero's actual costs incurred (as evaluated and unquestioned by the DCAA), plus the prime contractor's 5% markup on the subcontractor, plus plaintiff's G & A, profit, and bond costs. The Court acknowledges that the DCAA audit does not establish any causal link between the events plaintiff alleges and the costs it incurred, rather it establishes that the costs were incurred by Romero and supported by adequate documentation. Based on the testimony and evidence presented at trial, this Court finds that plaintiff has successfully demonstrated that in three of the five claims, the costs claimed are reasonable and are causally connected to the events on which they are based. Those claims are the stop work order on August 7, 1995, the stop work/two week

---

8. This figure represents the DCAA's unquestioned amount for Romero's costs plus plaintiff's G & A, profit, and bond costs.

9. This location was originally the far end of phase two.

10. This figure represents the DCAA's unquestioned amount for Romero's costs plus plaintiff's G & A, profit, and bond costs.

delay from August 8 to August 21, 1995, and the severed telephone line. Although questioned by the DCAA, this Court concludes that plaintiff successfully established that the prime contractor's 5% markup on the subcontract is reasonable and standard in the industry. The Court does not agree, however, that plaintiff is entitled to any costs related to ownership of equipment that was on standby, and thus plaintiff cannot recover for those claimed costs. Further, this Court finds that plaintiff's own indirect costs such as G & A, profit, and bond costs are reasonable and recoverable. Therefore, this Court finds that plaintiff is entitled to $53,873 in damages plus interest accrued from August 5, 1997, the date on which the claim was received by the contracting officer. A breakdown of the damages this Court finds plaintiff can recover is as follows:

| | Stop Work 7/7/95 | Stop Work/Two Week Delay 8/8/95–8/21/95 | Severed Telephone Line |
|---|---|---|---|
| Unquestioned Amount | $18,867 | $12,594 | $ 9,739 |
| Richards' G & A at 12.09% | $ 2,281 | $ 1,523 | $ 1,177 [11] |
| Richards' Profit at 10% | $ 2,115 | $ 1,412 | $ 1,092 |
| Richards' Bond at 1% | $ 233 | $ 155 | $ 120 |
| TOTAL: | $23,496 | $15,684 | $12,128 |

The total amount for the three claims is $51,308, plus the 5% mark-up on the subcontractor ($2,565), which equals $53,873. In accordance with the Contract Disputes Act, 41 U.S.C. § 611 (2001), the parties shall calculate the interest accrued from August 5, 1997, the date the claim was received by the contracting officer.

### CONCLUSION

For the reasons stated, this Court finds in favor of the plaintiff on the August 7, 1995 stop work claim, the August 8 to August 21, 1995 stop work/two week delay claim, and the severed telephone line claim. Damages shall be awarded to the plaintiff in the amount of $53,873 plus interest accrued from August 5, 1997, the date the claim was received by the contracting officer. The Clerk shall enter judgment for the plaintiff in this amount. Plaintiff's remaining claims for changes in patch size and disruptive changes in phasing/remobilization are dismissed.

---

**11.** Due to a mathematical error, this amount is listed as $1,337 in plaintiff's post trial brief. The correct figure is $1,177, *i.e.,* 12.09% of $9,739.