ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Optex Systems, Inc. ) | ASBCA No. 58220 |
| ) | |
| Under Contract No. W52H09-06-D-0229 ) | |

APPEARANCES FOR THE APPELLANT:  Albert B. Krachman, Esq.
Harrison R. Kang, Esq.
  Blank Rome LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:  Raymond M. Saunders, Esq.
  Army Chief Trial Attorney
  MAJ Cameron Edlefsen, JA
  Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE O'SULLIVAN
ON THE GOVERNMENT'S AFFIRMATIVE DEFENSES

Optex Systems, Inc. (Optex) appeals from a Contracting Officer's (CO's) final decision denying its claim for increased costs incurred in producing precision optical sighting instruments, known as M2A2 Aiming Circles, used by the U.S. military to aim howitzers. The government has asserted as affirmative defenses that appellant's claim is barred by release and by accord and satisfaction. The parties have submitted the issues of release and accord and satisfaction for decision on the written record pursuant to Board Rule 11. The Board has jurisdiction under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109. We find that appellant's claim is not barred by release or by accord and satisfaction.

FINDINGS OF FACT

1. On 23 January 2006, the Rock Island Arsenal, Rock Island, Illinois, (government) issued a solicitation for offers for award of a five-year Indefinite Delivery/Indefinite Quantity, firm-fixed-price contract for the production and delivery of the Aiming Circles (R4, tab 16). The solicitation reserved the right to make multiple awards. (R4, tab 15 at 2)

2. On 7 July 2006, the government awarded Contract No. W52H09-06-D-0229 (hereinafter the contract) to Optex (R4, tab 1). Delivery Order (DO) No. 0001, for 310 Aiming Circles in the total amount of $1,283,260.20, was also issued to Optex on

7 July 2006 (R4, tab 39). Costs to prepare for and undergo First Article Test (FAT) were included in the unit prices (*id.*).

3. The government also awarded a contract and a first delivery order for Aiming Circles to Radian Corp., a small business later acquired by DRS Technologies, Inc. (amended compl. and answer ¶ 34).

4. The contract required Optex to manufacture the Aiming Circles in accordance with specifications contained in Technical Data Package (TDP) No. 11785090 (R4, tab 15 at 11-12). Prior to the award to Optex and Radian, the Army was the sole manufacturer of Aiming Circles (Appellant's Rule 11 Cross Motion for Judgment on the Release Issue and Memorandum in Support, ex. B, decl. of Danny Schoening (Schoening decl.) ¶ 13). The majority of drawings in the TDP are dated from 1955-1960, and some from even earlier (gov't br., ex. 4, decl. of Anthony Corcella ¶ 10).

5. On 29 June 2007, the parties executed bilateral Modification No. P00002 to the contract (R4, tab 221). This modification incorporated four Engineering Change Proposals (ECPs) making changes to the TDP (*id.* at 2). All other terms and conditions remained unchanged (*id.*)

6. The first ECP, No. H06A2077 (ECP #1), updated the TDP to make the Aiming Circle easier to produce, using alternate materials for castings, new set screws, and different sealing compounds (Joint Stipulation of Material Facts (J. Stip.) ¶ 6.a). ECP #1 also corrected drawing callouts and added distribution statements (*id.*; R4, tab 65 at 2-3).

7. The second ECP, No. H06A2093 (ECP #2), updated the TDP to add alternate materials, add or correct missing or incorrect dimensions and tolerances, correct callouts, update finishes, add distribution statements, update cancelled standards, and add a new "QAP" (J. Stip. ¶ 7.a). ECP #2 stated: "Numerous issues with the TDP were found during preparations for initial production. These issues have been addressed in this ECP so that the M2A2 Aiming Circle TDP will be correct, up to date, and producible." (*Id.*; R4, tab 110 at 3)

8. The third ECP, No. H07A2004 (ECP #3), made more changes to the TDP "to address issues found during initial production planning" (R4, tab 156 at 1-2, 5).

9. The fourth ECP, Appellant's Request for Deviation No. H07A7006 (ECP #4), changed the brass alloy specified for a set screw at appellant's request (J. Stip. ¶ 9.a).

2

10. Appellant's Request for Equitable Adjustment (REA) dated 7 October 2010 calculated that these 4 ECPs encompassed 119 changes to the TDP (R4, tab 590 at 1). Subsequent ECPs brought the claimed total changes to the TDP to 254 (*id.*).

11. Beginning at the post-award orientation conference in September 2006, Optex requested that the government modify the limitation on progress payments to allow Optex to be reimbursed for the purchase of long lead items (R4, tab 43 at 4). The contract as awarded contained a special clause H-3, 52.232-4506, PROGRESS PAYMENT LIMITATION (MAR 1988), which provided:

> Prior to first article approval, only costs incurred for the
> first article are allowable for progress payments; however,
> such payments shall not exceed 10 percent (10 %) of the
> initial award value of the contract.

(R4, tab 15 at 22) The contract also contained the standard progress payments clause, Federal Acquisition Regulation (FAR) 52.232-16 (APR 2003) (*id.* at 27-30).

12. On 29 May 2007, following the approval of ECPs ##1-4, Optex submitted a list of parts that it considered to be long lead items and requested funding in the amount of $736,402 to cover the cost of ordering the parts (R4, tab 194). On 18 June 2007, the government responded that the submission was being reviewed, and requested that Optex add part numbers to its listing (R4, tab 208). Also on 18 June, Optex responded that it would provide a more detailed list, and inquired whether it would be possible to remove special clause H-3 (R4, tab 219 at 1). By letter dated 28 June 2007, the CO declined to remove the clause, stating that the government "does not want to risk an amount greater than the 10% of the contract value...because there is no evidence of progress of completed parts and/or parts that have been tested" (*id.* at 4).

13. On 2 July 2007, the contract specialist reminded Optex that the government was still awaiting the more detailed list of long lead items, and explained that although the government was unwilling to remove the H-3 clause, it was still willing to consider funding for long lead items (R4, tab 224).

14. By letter dated 10 July 2007, Optex provided the detailed list of long lead items and expressed its hope that the government would modify the contract to allow for the procurement of production material (R4, tab 228). On 31 July the government responded, requesting the delivery schedule for the listed items (R4, tab 237).

15. Following some clarifying communications, on 20 October 2007 Optex submitted a revised long lead item proposal detailing the parts, costs, and on-order dates needed to meet the contract's production delivery requirements (R4, tab 304). Funding was requested in a total amount of $490,799.89 (*id.*). The contract specialist

3

obtained internal government concurrence that the listed items met the definition of long lead items (R4, tabs 317, 319). She also obtained the concurrence of the administrative contracting officer to allow progress payments for those items (R4, tab 324). For reasons that do not appear in the record, however, the contract was not modified to allow for long lead item funding.

16. FAT commenced on 4 May 2009 (R4, tabs 510, 511).

17. On 5 May 2009 Optex resumed its request for funding of long lead items (R4, tab 512). In the interim, Optex had purchased parts needed for production at its own risk in order to expedite production after first article approval (*id.*). The total of Optex's at-risk expenditure was $1,352,563.60 (*id.*)

18. By 7 May 2009, two of three first article assemblies had passed all tests with the exception of pressure testing. One assembly had displayed an issue with plumb travel, and the government gave Optex the option of submitting a waiver request to allow for the problem to be fixed and tested without repeating all tests. (R4, tab 513)

19. On 7 May 2009, the government's item manager authorized payment for the long lead items purchased by Optex, stating: "Approved. We don't have much choice." (R4, tab 516)

20. On 18 May 2009, the government sent Optex Modification No. 02 to DO 0001 (Mod 2 to DO-1) (Version 1) authorizing long lead items in the amount of $982,437.60 (app. supp. R4, tab 1). Of this amount, $884,193.84 was eligible for payment pursuant to the 90 percent limitation of the progress payments clause, FAR 52.232-16 (*id.*).

21. Optex signed Version 1 of Mod 2 and returned it to the government on 19 May 2009 (app. supp. R4, tab 2).

22. Between 19 May and 22 May 2009, the parties realized that Mod 2 was missing a revised delivery schedule (Schoening decl. ¶ 40). On 21 May 2009 the contracting officer's representative (COR) emailed Optex with the revised schedule that had been discussed and asked that Optex confirm that it agreed with the new schedule (R4, tab 526). Optex's Mr. Schoening responded on 22 May:

> Matthew, this schedule is acceptable. We are still working through the details of fitting the gear to the main housing with the supplier, but this schedule allows for a reasonable amount of time for them to perform this operation.

(*Id.*)

4

23. On 22 May 2009, the government emailed Optex the contract modification containing both the long lead item funding authorization and the new schedule (Mod 2 to DO-1, Version 2) (app. supp. R4, tab 3). In addition to the long lead funding and the new schedule, Version 2 added the stipulations that there would be no cost to either party and that earlier delivery was authorized if at no additional cost to the government (*id.*).

24. On 26 May 2009, at 2:30 pm, the COR emailed Optex with Version 3 of Mod 2, stating that his CO had reviewed the modification and asked him to make an addition to page 2 (app. supp. R4, tab 4). The addition, paragraph 6, consisted of the following: "The contractor hereby waives all rights and claims for equitable adjustments attributable to such facts and circumstances giving rise to the above changes and documentation, including any delays" (*id.*).

25. This version caused some concern within Optex. Renita Rutherford, Optex's contract administrator, called the COR, Matthew Kopel, to ask him why the government added that language and to inform him that Optex could not agree to that language and that she would need to speak to Optex leadership (gov't br., ex. 3, dep. of Renita Rutherford (Rutherford dep.) at 41-42). Ms. Rutherford then talked to Mr. Schoening, and they discussed what possible connection the added language might have to the two purposes of Mod 2, long lead funding and revised delivery schedule (gov't br., ex. 2, dep. of Danny Schoening (Schoening dep.) at 53-54).

26. Mr. Schoening expressed the view that Optex could waive claims for issues experienced up to 26 May 2009 (Rutherford dep. at 42, 47).

27. Ms. Rutherford called Mr. Kopel back and told him that Optex was willing to agree to waive claims for "anything before this day," but needed to carve out from the scope of the release emerging assembly issues, including the mating of the gear to the housing (Rutherford dep. at 42). Mr. Kopel agreed to capture that reservation in a revised modification (*id.*).

28. At 4:15 pm on 26 May 2009, the government sent Optex Version 4 of Mod 2 (app. supp. R4, tab 5 at 1). Version 4 added the following language, replacing paragraph 6 in Version 3:

> The parties intend this modification to address all of the past issues on this contract as of 26 May 2009. Therefore, this modification represents a complete and full settlement of all claims, demands, and causes of action that Optex may raise for any incidents, directed/constructive changes, and any other matters, occurring on or before 26 May 2009, including any claims for delay, and any other causes

of action, known or unknown to Optex, whether asserted at this time or not, arising under this contract. This Modification will not affect any claims or causes of action pertaining to incidents, directed/constructive changes, or other matters which occur after 26 May 2009.

(*Id.* at 3)

29. Ms. Rutherford testified that upon receiving this version, she went back to Mr. Schoening "and told him they still didn't do what we asked them to do" (Rutherford dep. at 44). She further stated:

> And I told him that I would draft up language for him to take a look at for us to go back to Matt with, but if he agreed with the—the language that they came back with, the delivery schedule and the long lead time items, then we could craft this language to further explain what we were saying in the conversation and send that back to him.

(*Id.*)

30. At 4:47 pm, Ms. Rutherford emailed a signed modification (Version 4) back to the government with the following note:

> Matt,
>
> Please find attached the signed modification. Although it is understood that this modification encompasses all issues thru today, there is still one issue outstanding that we are working and has not been resolved regarding the mating of the gear to the housing. When this issue is resolved and if it involves changes to the TDP which may require Optex to incur additional costs we will at that time pursue a modification and/or equitable adjustment to the contract to encompass the change and additional costs.

(App. supp. R4, tab 5 at 1)

31. Ms. Rutherford testified that she did not ask the government to add the language in her email to the modification because by:

> [S]pelling it out in my e-mail and letting them know that, you know, we had this—this issue, and it needed to be

6

carved out. And that we are going to, you know, request an equitable adjustment at that time, if it should be an issue, would have been enough.

(Rutherford dep. at 48)

32. Mr. Schoening testified that Optex's view of the release language in Version 4 of Mod 2 was that:

> It appeared to relieve the Government of—of liability on issues prior to May 26, 2009. But it seemed to have too much breadth in the statement. So we—we wanted to communicate our outstanding issue with the assembly issues, so we captured the assembly issues in the cover letter e-mail, which is Government Exhibit Number 11.
>
> Q [Government Counsel] Okay. So did Optex disagree with item number 6 as—in the final version?
>
> A We didn't agree with it, and we didn't disagree with it. It seemed too broad. We didn't understand the breadth and how it was focused on the two problems at hand: The long lead time material and the schedule.

(Schoening Dep. at 62)

33. The government executed Version 4 of Mod 2 on 28 May 2009 (R4, tab 529). The CO testified that she reviewed the language in Ms. Rutherford's email and considered it to be further clarification of and consistent with the intent of paragraph 6 of the modification:

> A I didn't review it as a problem because they stipulated here that they had an issue that's still not resolved and that if there's changes to the TDP, which may require Optex to incur additional costs, they had more than a right to submit an REA or a request for equitable adjustment. But the mod stipulates up until May 26, 2009, all the issues are covered. And, remember, there's only three units for first article.
>
> Q Sure.
>
> A So this is not production. This is not, you know, for the quantity that was to be delivered, if they're still having problems making these items, they haven't finished

7

with first article, they haven't finished with production. We're not there yet.

Q Got it.

A All the mod did was—the modification that we had revised the schedule with the long lead item provision in and that's all it was doing and it was saying, okay, any of the past issues are done, so...

Q So it was your understanding that Ms. Rutherford-Drake's language wasn't a problem because it wasn't—that wasn't what the waiver language in the mod covered?

A The waiver language covered through 26 May 2009. Anything after that they have the right to submit an REA. If they can support it, fine. That's their prerogative.

Q So there was no issue with her saying that they had this outstanding issue relating to the mating of the gear to the housing, as far as you were concerned, that was a future issue?

A As far as what this says, this was just basically further clarification to what Matt and Ms. Drake worked out in that language, that, you know, if something comes up in the future, then they have a right to submit a claim. I don't have an issue with that. It just provides further clarification to what the language was in the mod.

(Gov't br., ex. 1, dep. of Joyce Klein at 100-02)

34. Following the execution of Mod 2, Optex submitted an invoice for the cost of long lead items for the Aiming Circle production quantities and received payment (Schoening Dep. at 76).

35. On 28 August 2009, Optex received notice from the government that its FAT report had been approved and that it was cleared to begin production of the M2A2 Aiming Circle (R4, tab 574).

36. On 7 October 2010, after successful delivery of approximately 60 percent of the quantity called for under DO 1, Optex submitted a request for equitable adjustment in the amount of $966,735 (R4, tab 590). Optex cited the cost of making 254 changes to the TDP, the cost of communicating those changes to its supply chain, the assembly time required to produce the Aiming Circles in excess of what could reasonably have been expected, material losses, and delay and disruption resulting from the totality of the issues cited (*id.*).

37. After review, on 10 November 2010, the government requested further information from Optex:

> TACOM Contracting Center needs further information in the area of your letter, paragraph 1 page 2 as to the tasks and how the specific costs incurred relate to items 1 through 6. Please provide a breakdown of this information into specific costs by action: labor hours and rates, vendor quotes, etc. to support specific extra material expenses, indirect rates, etc. incurred. The breakdown of costs must relate to items 1-6 and support the REA cost proposal as shown in attachment A.

(R4, tab 599)

38 On 17 November 2010, Optex responded with the requested detail (R4, tab 600).

39. On 6 January 2011, Optex wrote to the CO in response to a letter from the CO dated 27 December 2010 which does not appear in the record[1] (R4, tab 604). Optex summarized the CO's letter as follows:

> Per your letter dated 27 December, 2010 you stated that Modification 02 of Delivery Order 0001 was signed by Optex and the Government on or around 26 May, 2009. Further, you've stated that Optex needs to specify the costs associated prior to this date and subsequent to that date. And finally, you've asked that Optex review and submit claims according to FAR 33.207. Please see below where we have described these claims in detail...and we are submitting this claim per FAR 33.207 for only those costs occurring after 26 May, 2009.

(*Id.*) Optex's claim in the amount of $879,169.05 was certified by Mr. Danny Schoening, Optex's General Manager and Chief Operating Officer, and Karen Hawkins, Optex's Vice President of Finance and Controller (*id.*).

---

[1] An undated draft of the CO's letter is appended as exhibit G to appellant's Memorandum in Support of Appellant's Cross-Motion for Judgment on the Release Issue.

40. On 6 May 2011, the contract was modified to transfer contract administration authority from the TACOM Contracting Center at Rock Island, Illinois to the TACOM Contracting Center at Warren, Michigan (R4, tab 605).

41. The record indicates that Optex began communicating with the new CO, Mr. Howard Lewis, in December of 2011 regarding its outstanding claim (R4, tabs 606, 607). Optex was responding to the new CO's requests for information (*id.*).

42. On 9 January 2012 the new CO wrote to Optex acknowledging receipt of a copy of Optex's 6 January 2011 certified claim. He requested further information regarding (1) the "additional costs associated with all the changes done to the contract prior to 26 May 2009," (2) "costs you claim that you could not have anticipated after 26 May 2009 because of an alleged defective TDP," and (3) a "detailed assessment" "concerning whether a prudent manufacturer of devices similar to the Aiming Circle could have and/or should have anticipated any additional costs for producing the Aiming Circle on 26 May 2009...." (R4, tab 611)

43. Optex responded on 11 January 1012 (R4, tab 612 at 4). As to the first item, Optex incorporated cost information previously submitted in 2010 showing pre-26 May 2009 costs of $189,684.51. As to the second item, Optex updated its previously submitted claimed amount ($879,169) by omitting FAT costs and updating incurred costs, for a total of $903,262 (*id.* at 5).

44. As to the third item, Optex responded:

> In July of 2005, Optex and Radian (soon thereafter purchased by DRS Technologies) were given almost identical contracts, each for the same quantity and almost exact same prices. Over the next 4 years both companies worked with the Government to make 254 changes to 141 different documents.... Some of these changes were recommended by DRS, some by the Government, and some by Optex. The intent of this complete overhaul of the TDP was to end up with a reasonable TDP which a prudent contractor skilled in the field of Fire Control products would be able to reliably and repeatedly produce.
>
> We all failed.
>
> While the TDP is in much better condition, the dimensions and tolerances captured in the drawings do not allow a prudent contractor to assemble the device with a reasonable process in a reasonable amount of time. The

> evidence of this is that DRS failed their FAT Testing 6
> times! A company with the knowledge of Fire Control and
> the vast resources of a large corporation and even after 254
> changes to the TDP the parts that they submitted would not
> meet the upper level print requirements....
>
> Given this background, and the fact that Optex has
> completed the contract and that Optex has completed
> multiple contracts in Fire Control (M187 Mounts, M137
> Pantels, Abrams CWSS, Bradley Back Up Weapon Sights,
> ASM M36 Weapon Sights, etc.), we believe that Optex has
> repeatedly shown the capability to produce Fire Control
> Products which have exceptional Quality, Field
> Performance, and Field Reliability.

(R4, tab 612 at 5-6) Optex went on to explain that it could not in May 2009 anticipate the additional costs of assembly because, due to the extremely long period of time between contract award and FAT taken up with TDP changes, Optex had already ordered and received most of the production material and was under pressure from the government to complete FAT and begin production. Both contractors were late, and the customers were "furious." As a consequence, Optex's priority was to get three units into FAT without taking the time first to reengineer the manufacturing process or to modify material already ordered. The three first article units were produced and the "general" assembly processes were documented but there was no time to develop the most efficient way to make the assemblies in the future due to government driven urgency. While they understood the process of "mixing and matching" piece parts under the applicable MIL STD and had done so under other contracts, the complexity of this particular requirement and the need to also "mix and match" subassemblies was not known in May 2009. (*Id.* at 6)

45. The government's views upon review of Optex's submission were mixed. One engineer thought that a prudent contractor who was "familiar with the production and assembly of circa 1950 military optical fire control" would be able to produce an Aiming Circle with the original TDP (R4, tab 614 at 1).

46. The government's quality assurance specialist did not believe that a prudent manufacturer of similar devices could have anticipated the additional cost and production problems to be encountered after 26 May 2009 (R4, tab 614 at 3). He stated:

> [T]he uniqueness of this item is such that I have not
> encountered any other device utilized and purchased by the
> government for fire control that is similar to the aiming

11

circle quadrant. This item is unique to the interaction of optics and mechanical gears to produce the accuracy that is required. With that I do not believe the additional problems and cost could be foreseen. To this contractors [sic] credit they did achieve success where the other contractor did not. OPTEX continued to improve where the other contractor would not. At this date I cannot with all honesty say that the government has supplied this contractor (OPTEX) with a fully functional up to date tech data package and that future problems or cost could not be encountered.

(*Id.*)

47. A third engineer was of the opinion that:

The pertinent question is, once all the parts are made to print will they fit together in an assembly line fashion to make a working aiming circle. Apparently not. That being the case, would a thorough review of the TDP, and the experience leading up to First Article provide enough information for a contractor to know what it will take to produce working aiming circles. ...[O]nce you've gone through the TDP thoroughly enough to make the FAT units, and assembled them, you should know what it will take to make the remaining units.

(R4, tab 615)

48. In mid-February 2012, at the CO's request, Optex provided further detail in support of its assertion that it could anticipate mixing and matching piece parts but not the added complexity of mixing and matching subassemblies (R4, tabs 617, 618). A meeting to discuss Optex's claim was held on 19 April 2012 (R4, tabs 619-23).

49. By letter dated 31 May 2012, the CO denied Optex's claim (R4, tab 626). His final decision does not find that Optex released its claims to costs incurred after 26 May 2009 in Mod 2. To the contrary, the final decision refers to 26 May 2009 as "the date Optex waived all claims for past costs." (*Id.* at 3) The CO denied the claim because "Optex should have known when it signed the contract that extensive hand fitting of the parts of the Aiming Circle was possible" (*id.*).

12

50. Optex appealed to this Board on 9 July 2012 (R4, tab 628). Via its second amended answer filed on 1 November 2013, the government raised for the first time the affirmative defenses of release and accord and satisfaction.

51. On 3 January 2014, the parties jointly moved for "Bifurcated Determination on Respondent's Affirmative Defenses Related to Release," requesting that these issues be decided on the record pursuant to Board Rule 11 without a hearing. The Board granted the parties' motion and set a briefing schedule. Briefing was completed on 18 July 2014.

## DISCUSSION

Release and accord and satisfaction are separate affirmative defenses. *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010). "A release is a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another." *Id.* An accord and satisfaction occurs when "a claim is discharged because some performance other than that which was claimed to be due is accepted as full satisfaction of the claim." *Id.* (citing *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed. Cir. 2002). Although the defenses are distinct, "an agreement may constitute both a release and an accord and satisfaction, either of which may bar future claims." *Holland*, 621 F.3d at 1377; *Colorado River Materials, Inc.*, ASBCA No. 57751, 13 BCA ¶ 35,233 at 172,991.

The party asserting the affirmative defense of accord and satisfaction has the burden of proving all four elements of the defense. *Troy Eagle Group*, ASBCA No. 56447, 13 BCA ¶ 35,258 at 173,060. The four elements are: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration. *Holland*, 621 F.3d at 1382. The government must show mutual agreement in satisfaction of a claim which is a *bona fide* dispute. *Wright Assocs., Inc.*, ASBCA No. 33721, 87-3 BCA ¶ 20,056 at 101,535.

In interpreting a release, general principles of contract interpretation apply. *Information Systems & Networks Corp. v. United States*, 68 Fed. Cl. 336, 341 (2005). "[T]he inquiry regarding releases should focus on the intent of the parties at the time the release is executed, and this intent should be sought from the whole and every part of the instrument...." *Futuronics Corp.*, ASBCA No. 29324, 85-2 BCA ¶ 18,137 at 91,045. If the provisions of a release are "clear and unambiguous, they must be given their plain and ordinary meaning." *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009). Conversely, if the words defining the scope of the release are ambiguous in their application to a contractor's claim, courts and boards will ascertain the parties' intent by examining the parties' conduct leading up to the modification. *R.P. Richards Constr. Co. v. United States*, 51 Fed. Cl. 116, 122 (2001) (additional evidence can be considered when there is ambiguity in the terms of the

agreement); *Chantilly Constr. Corp.*, ASBCA No. 24138, 81-1 BCA ¶ 14,863 at 73,397 (modifications' scope did not include contractor's claims for delay and impact costs where such costs were not considered by the parties during negotiations leading up to the modifications); *see also Hanley Industries, Inc.*, ASBCA No. 54315, 05-2 BCA ¶ 33,032 at 163,711. Where a contract contains terms that are susceptible of more than one meaning, and extrinsic evidence does not clearly establish the parties' intent, the document will be given that meaning that is more favorable to the party that did not draft it. *Peter Kiewit Sons' Co. v. United States*, 109 Ct. Cl. 390, 418 (1947); *Information Systems & Networks*, 68 Fed. Cl. at 342.

The government asserts that Mod 2 to DO-1 operated both as a release of Optex's increased assembly cost claim and as an accord and satisfaction discharging Optex's claim for increased assembly costs. In order to sustain its burden of proof on either defense, it must show that both parties intended Mod 2 to release and/or discharge the claim that is the subject of this appeal.

In ascertaining the intent of the parties, we first look to the four corners of the document to determine if the release contained therein is "clear and unambiguous." Version 4 of Mod 2 is the version signed by both parties. The executed modification states that its purpose is to: (1) "Allow the purchase of long lead items prior to First Article approval to facilitate on-time delivery"; (2) authorize payment requests of no more than 90 percent of the approved amount for long lead items; (3) supersede the Progress Payment Limitation clause; (4) formally incorporate a revised delivery schedule; (5) do this at no cost to either party; (6) incorporate the waiver language at issue (discussed below); and (7) authorize early delivery if at no additional cost to the government. (App. supp. R4, tab 5 at 2 of 4)

Paragraph 6 contains the waiver language inserted following Optex's expression of its concerns that the waiver language in Version 3 of Mod 2 was too broad. It begins: "The parties intend this modification to address all of the *past issues* on this contract as of 26 May 2009." (Finding 28) (Emphasis added) It goes on:

> Therefore, this modification represents a complete and full settlement of all claims, demands, and causes of action that Optex may raise for any incidents, directed/constructive changes, and any other matters, occurring on or before 26 May 2009, including any claims for delay, and any other causes of action, known or unknown to Optex, whether asserted at this time or not, arising under this contract.

14

Finally, paragraph 6 concludes with the following sentence: "This Modification will not affect any claims or causes of action pertaining to incidents, directed/constructive changes, or other matters which occur after 26 May 2009." (*Id.*)

We find that the language of paragraph 6 of Mod 2 is not clear and unambiguous. While the language used in the second sentence, particularly the words "known or unknown," is very broad and could be argued to encompass all claims whose operative facts occurred prior to 26 May 2009, even though unknown to Optex at that time, such a reading would conflict with the first sentence, restricting the scope of the release to "past issues." An unknown claim could not be a "past issue on this contract." The term "past issue" necessarily implies that the parties have had a dispute, or disagreement, or at least a discussion of differing views on the matter.

When interpreting the language of a contract, the Board must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991); *Chamac, Inc.*, ASBCA No. 44905, 94-1 BCA ¶ 26,482 at 131,817. The first sentence clearly states the parties' intent "to address all of the past issues on this contract as of 26 May 2009." To give effect to this intent, and to read the paragraph as a harmonious whole, requires that the scope of the second sentence be restricted to "causes of action, known or unknown to Optex," pertaining to known "past issues on this contract." Alternatively, a broader reading of the second sentence (as urged by the government) would introduce an internal inconsistency, and therefore an ambiguity, the resolution of which would require extrinsic evidence of the parties' understanding of the scope of the release. *R.P. Richards Constr.*, 51 Fed. Cl. at 122; *Information Systems & Networks*, 68 Fed. Cl. at 342; *Chantilly Constr.*, 81-1 BCA ¶ 14,863 at 73,397.

The record contains evidence, from both the government and the contractor, indicating that both parties understood at the time they entered into Mod 2, and subsequently, that issues and additional costs encountered by Optex with respect to assembly of Aiming Circles up to and including 26 May 2009 were included within the scope of the release, while issues and costs pertaining to assembly of Aiming Circles post-26 May 2009 were not.

Thus, the CO at the time Mod 2 was entered into, Ms. Klein, testified that she understood that Optex had an issue that was not resolved, but in her view the modification covered only up to 26 May 2009, and "[a]nything after that they have the right to submit an REA." She testified that all Mod 2 did was revise the delivery schedule with the provision for long lead items. Indeed, she specifically stated that up to 26 May 2009, "there's only three units for first article," "[s]o this is not production. This is not, you know, for the quantity that was to be delivered, if they're still having problems making these items, they haven't finished with first article, they haven't finished with production. *We're not there yet.*" (Finding 33) (Emphasis added)

15

The witnesses for appellant testified to a view consistent with the CO's. Ms. Rutherford, appellant's contract administrator, and Mr. Schoening, Optex's General Manager and COO, stated that Optex became concerned when the government began adding waiver language to the modification because they did not understand what connection the language had to the purpose of the modification, which was to resolve the past issues pertaining to long lead item funding and revise the delivery schedule. (Finding 25) Ms. Rutherford specifically informed the government's COR, Mr. Kopel, that Optex could agree to waive claims for "anything before this day," but needed to carve out from the scope of the release any assembly issues going forward (finding 27). Mr. Kopel agreed to effectuate this limitation in revised language (*id.*). Shortly thereafter, he sent Optex the language that is in the executed modification, limiting the scope of the waiver to "past issues on this contract as of 26 May 2009" and specifically excluding claims or causes of action pertaining to matters occurring after 26 May 2009 (finding 28).

Optex was not satisfied with the final language but signed the modification and sent it back with an email specifying that the issue they were currently working with regard to the mating of the gear to the housing "has not been resolved" and was outside the scope of the waiver (finding 30). The CO, Ms. Klein, viewed this statement as consistent with the intended scope of the release, and not as an exception to that scope (finding 33).

The testimony of these witnesses is also consistent with the totality of the record in this case, in that the record is replete with communications pertaining to the issue of long lead item funding, beginning in September of 2006, 32 months prior to the execution of Mod 2, and continuing up to its execution in May of 2009 (findings 11-15, 17, 19-23). Thus, there is no doubt that long lead item funding belongs to the category of "past issues on this contract," in the words of Mod 2, paragraph 6. In stark contrast, the record is devoid of any communications whatsoever pertaining to a potential claim for assembly issues until the government's insertion of waiver language into Version 3 of the modification prompted Optex to seek clarification of the scope of the release.

Additionally, the conduct of the parties after a contract modification has been signed is relevant evidence of their intentions with respect to the scope of a release contained in that modification. *England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 849-50 (Fed. Cir. 2004) (citing *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1581 (Fed. Cir. 1993)).

The conduct of the government after Optex submitted its REA in October of 2010, up to the issuance of the CO's final decision denying Optex's claim on 31 May 2012, evidenced its continuing agreement that a claim for assembly issues after

26 May 2009 was not foreclosed by Mod 2. Thus, the government requested that Optex segregate its claimed costs into those incurred before and after 26 May 2009. (Finding 39) Optex responded by eliminating pre-Mod 2 costs and resubmitting a certified claim only for costs incurred after 26 May 2009 (*id.*). After contract administration was transferred to a new CO, he requested further information about costs incurred before 26 May 2009 and why Optex could not or should not have anticipated, on or before 26 May 2009, the additional costs occurring after 26 May 2009 (finding 42).

Not even in the final decision denying Optex's claim in its entirety does the government take the position that the claim was released in Mod 2. Indeed, the final decision refers to 26 May 2009 as "the date Optex waived all claims for *past* costs" (emphasis added). Rather, the final decision is based on the CO's view that the TDP was not defective and that Optex was on notice when the contract was awarded that extensive hand fitting of piece parts might be required. (Finding 49)

## CONCLUSION

We conclude, based on the preponderance of evidence in the record, that Mod 2 was neither a release nor an accord and satisfaction of the claim presented by Optex in this appeal. We base this conclusion on the ample evidence, including the language of Mod 2, that neither party intended for Mod 2 to encompass claims for post-26 May 2009 matters, as they were not "past issues on this contract." Because we reach this conclusion based on the mutual intent of the parties, it is unnecessary for us to address the other elements of the affirmative defenses advanced by the government. We note, however, that had we reached a different conclusion about the parties' intent, there would remain an issue whether Optex received any consideration.

This decision under Rule 11 goes only to the issue of whether appellant's claim is barred by either release or accord and satisfaction. We conclude it is not, for the reasons expressed above. We express no opinion on the merits of appellant's claim.

Both parties have made a number of arguments that we find no need to address given the scope of and the basis for our decision.

Dated: 6 November 2014

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

17

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58220, Appeal of Optex Systems, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

18